O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ARAGONEZ;<br>SALVADOR LOZANO, | Case No. EDCV 07-00992-VAP<br>(OPx) |
| Plaintiffs, | **[Motions filed on October<br>13, 2008 and October 14,<br>2008]** |
| v. | |
| COUNTY OF SAN<br>BERNARDINO; GARY PENROD;<br>ALVIN HUFF; P. RECATTO;<br>AND DOES 1-10,<br>INDIVIDUALLY , | **ORDER GRANTING DEFENDANT<br>HUFF'S MOTION FOR PARTIAL<br>SUMMARY JUDGMENT** |
| Defendants. | **ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANT<br>RECATTO'S MOTION FOR SUMMARY<br>JUDGMENT** |
| AND RELATED CROSS-CLAIMS | |

Defendant Huff's Motion for Partial Summary Judgment
and Defendant Recatto's Motion for Summary Judgment came
before this Court for hearing on November 17, 2008.
After reviewing and considering all papers filed in
support of, and in opposition to, the Motion, as well as
the arguments advanced by counsel at the hearing, the
Court GRANTS Defendant Huff's Motion and GRANTS in part
and DENIES in part Defendant Recatto's Motion.
///

# I. BACKGROUND

Plaintiffs David Aragonez ("Aragonez") and Salvador Lozano ("Lozano") bring this action against Defendants San Bernardino County Sheriff's Deputy Alvin Huff ("Huff") and California Highway Patrol Sergeant Pete Recatto ("Recatto"), who encountered, detained and eventually arrested Plaintiffs in San Bernardino on August 10, 2005.

Plaintiffs assert the following claims against Huff and Recatto, all based on 42 U.S.C. § 1983:[1]

(1) violation of their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by subjecting them to an unjustified and excessive detention;

(2) violation of their rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by subjecting them to a false arrest;

///
///
///

---

[1] Plaintiffs originally brought a Monell claim against the County of San Bernardino and Gary Penrod in his capacity as Sheriff of San Bernardino County. The parties filed a stipulation to dismiss the claims against those Defendants on October 30, 2008.

1      (3) violation of their rights under the Fourth and

2           Fourteenth Amendments to the U.S. Constitution

3           by subjecting them to excessive force;[2] and

4

5      (4) violation of their rights to substantive due

6           process under the Fourteenth Amendment by

7           misrepresenting facts or concealing exculpatory

8           information in the ensuing criminal

9           investigation (the "substantive due process

10          claim").

11

12 (Compl. ¶¶ 23-41).

13

14    Before the Court are two related motions for summary

15 judgment.  On October 13, 2008, Huff filed a Motion for

16 [Partial] Summary Judgment or Summary Adjudication ("Huff

17 Mot."), seeking judgment in his favor on the substantive

18 due process claim, and lodged a Statement of

19 Uncontroverted Material Facts and Conclusions of Law

20 ("HSUF").  Huff argues that Plaintiffs have failed to

21 produce evidence of any injury under the Fourteenth

22 Amendment.  Huff Mot. at 5.

23

24    On October 14, 2008, Recatto filed a Motion for

25 Summary Judgment and Summary Adjudication of Claims

26

27       [2] Claims 1-3 are referred to collectively as "the

28 Fourth Amendment claims."

1  ("Recatto Mot.") and Memorandum of Points and Authorities

2  ("Recatto Mem."), and lodged a Statement of

3  Uncontroverted Facts and Conclusions of Law ("RSUF").  As

4  to the Fourth Amendment claims, he argues: (1) the

5  undisputed facts created reasonable suspicion and

6  probable cause to detain and arrest Plaintiffs; (2) the

7  undisputed facts show that Recatto himself did not detain

8  or arrest Plaintiffs; and (3) he should be afforded

9  qualified immunity for any acts he did commit.  (Recatto

10  Mot. at 2.)  He argues Plaintiffs cannot establish a

11  Fourteenth Amendment violation in support of their

12  Substantive Due Process Claim.  (<u>Id.</u>)

13

14      Plaintiffs filed Oppositions and Memoranda of Points

15  and Authorities[3] on November 3, 2008, and also lodged two

16  Statements of Genuine Issues of Material Fact.[4]

17

18                **II. LEGAL STANDARD**

19      A motion for summary judgment shall be granted when

20  there is no genuine issue as to any material fact and the

21

22  _____

23      [3] The Opposition to Huff's motion is referred to here
    as "Opp'n-Huff"; the Opposition to Recatto's motion is
    referred to as "Opp'n-Recatto".

24

25      [4] Although Plaintiffs filed statements of genuine
    issues of material fact for both motions for summary
    judgment, they assert identical facts as to the incident.
26  All references to the PSGI are to Plaintiffs' Statement
    of Genuine Issues of Material Fact in Opposition to
27  Recatto's Summary Judgment Motion.  Where necessary to
    cite to the SGI in opposition to Huff's Motion, the Court
28  refers to it as PSGI-Huff.

moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986).   The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict." <u>Anderson</u>, 477 U.S. at 250.

Generally, the burden is on the moving party to demonstrate that it is entitled to summary judgment. <u>Margolis v. Ryan</u>, 140 F.3d 850, 852 (9th Cir. 1998); <u>Retail Clerks Union Local 648 v. Hub Pharmacy, Inc.</u>, 707 F.2d 1030, 1033 (9th Cir. 1983).   The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Where the non-moving party has the burden at trial, however, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case.   <u>Celotex</u>, 477 U.S. at 325. Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's case.   <u>Id.</u>

The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that

must be resolved at trial.  Fed. R. Civ. P. 56(e);
Celotex, 477 U.S. at 324; Anderson, 477 U.S. at 256.  The
non-moving party must make an affirmative showing on all
matters placed in issue by the motion as to which it has
the burden of proof at trial.  Celotex, 477 U.S. at 322;
Anderson, 477 U.S. at 252.  See also William W.
Schwarzer, A. Wallace Tashima & James M. Wagstaffe,
Federal Civil Procedure Before Trial § 14:144.

     A genuine issue of material fact will exist "if the
evidence is such that a reasonable jury could return a
verdict for the non-moving party."  Anderson, 477 U.S. at
248.  In ruling on a motion for summary judgment, the
Court construes the evidence in the light most favorable
to the non-moving party.  Barlow v. Ground, 943 F.2d
1132, 1135 (9th Cir. 1991); T.W. Electrical Serv. Inc. v.
Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31
(9th Cir. 1987).

### III. UNCONTROVERTED FACTS

     Defendants submitted Statements of Uncontroverted
Facts, and Plaintiffs submitted Statements of Genuine
Issues of Material Fact.  The Court finds the following
facts uncontroverted; the remaining facts set forth in
the parties' respective submissions are deemed
controverted and discussed below.
///

**A.   The Incident**

Recatto and Huff ("the officers") were patrolling the City of Highland on August 10, 2005 to gather intelligence about gang activities in the area.  (RSUF ¶ 4.)  At approximately 5:30 p.m., Recatto and Huff pulled their unmarked white patrol car into the driveway of the residence of Aragonez's mother,  where Aragonez was standing behind a pickup truck.  (PSGI ¶¶ 6, 13, 17, 38.)  When the officers got out of their car, Aragonez said "What the fuck do you want?"  He was uncooperative and argumentative in response to Huff's questions.  (PSGI ¶ 6; RSUF ¶ 8-1.[5])  Huff ordered Aragonez to put his hands behind his back, and Aragonez remained uncooperative, cursing and directing racially derogatory language at Huff.  (PSGI ¶¶ 43-44.)

Huff repeatedly told Aragonez to calm down, and told Aragonez, "You are coming at this all wrong."  (PSGI ¶ 45.)  The two argued for several minutes, and Aragonez continued to curse at Huff, who pulled his taser from his utility belt, but did not deploy it.  (PSGI ¶ 47; Recatto Dep. at 104.)[6]  Aragonez then complied with Huff's

---

[5] Recatto's Statement of Uncontroverted Facts contains two paragraphs numbered "8."  The first such paragraph is referred to as "8-1" and the second as "8-2."

[6] Huff has invoked his right under the Fifth Amendment and refused to testify about any of the events alleged in Plaintiffs' complaint. (PSGI-Huff ¶¶ 92-98.)

instructions to calm down, and Huff handcuffed him, and put him in the back seat of the patrol car.  (PSGI ¶ 49.) Huff subsequently placed Aragonez under arrest for violating California Penal Code section 647(f), disorderly conduct - being found under the influence of liquor or drugs in a public place. (RSUF ¶ 11.)

While Huff was engaged with Aragonez,[7]  Lozano came out from behind the house and into the driveway, carrying a compressor on his shoulder.  (PSGI ¶ 8, RSUF ¶ 8-2.) Recatto suspected Plaintiffs may have been involved in a residential burglary and were under the influence of alcohol; thus, he believed the circumstances warranted further investigation.  (RSUF ¶¶ 9-10; Recatto Dep. 78: 218-21.)[8]

Recatto instructed Lozano to put down the compressor and put his hands behind his back.  (PSGI ¶ 51.)  At this point, Huff took over, eventually handcuffing Lozano, placing him under arrest, and putting him into the patrol car. (PSGI ¶¶ 52-53; RSUF ¶ 12.[9])

---

[7] The parties dispute the precise timing of this, but the discrepancy is immaterial.

[8] Plaintiffs dispute this fact, but do not succeed in controverting it, since their objection is merely a legal conclusion that there was insufficient bases for Recatto's suspicions - not that he did not have those suspicions.  See PSGI ¶ 9.

[9] Although Plaintiffs attempt to dispute this fact,
(continued...)

1   Once Huff began driving to the West Valley Detention
2   Center, Aragonez and Lozano asked several questions about
3   their arrests and their destination.  (PSGI ¶ 60; RSUF ¶
4   14.)  En route, Aragonez and Lozano "kicked [out] the
5   windows of the car," (PSGI ¶ 63), after which Huff pulled
6   the car into a restaurant parking lot.  (PSGI ¶ 63.)

7

8   There, Huff sprayed both Plaintiffs with chemical
9   spray.  (PSGI ¶ 66; Recatto Dep. at 128-29.)  At least
10  one backup officer arrived, and he, Huff, and Recatto
11  removed Aragonez from the patrol car and placed him into
12  a restraint. (PSGI ¶¶ 72-73; Recatto Dep. at 134-135.)
13  The officers placed Aragonez in another patrol car, and
14  took both Plaintiffs to the West Valley Detention Center.
15  (PSGI ¶ 74; Recatto Dep. 135:14-16, 137:24-138:3.)

16

17  **B.   The Belt Recording and Police Report**
18  A device on Huff's utility belt recorded the events
19  at Aragonez's mother's house.  The transcript of this
20  recording, referred to as the "belt recording," is

21

22

23

24

---

25      [9](...continued)
26  their response to Defendants' SUF merely states that
    Recatto "participated" in taking Lozano into custody.
27  This fails to create a dispute as to who placed Lozano
    under arrest, as Plaintiffs cite no evidence showing that
28  Recatto took Lozano into custody.  See PSGI ¶ 12.

attached as Exhibit 2 to Sheriff's Department employee Dan Garcia's Declaration.[10]

Huff prepared a police report about the incident, (Garcia Decl. 2, Ex. 1 ("Report")), which Plaintiffs claim contained several falsehoods.[11]

## C.   The Criminal Prosecution

Aragonez and Lozano, represented by counsel, were arraigned on August 12, 2005, on felony charges of violating California Penal Code § 594(b)(1), vandalism of public property ($400 or more).[12]  Both entered "not guilty" pleas.  (Christensen Decl. ¶ 3, Ex. 1 (Criminal Court Docket).)

Plaintiffs moved to suppress their arrests under California Penal Code §  1538.5; the Superior Court granted their motions.  (No details of the basis for the

---

[10] Plaintiffs claim this recording establishes that Aragonez and Lozano "were not completely uncooperative." (PSGI-Huff ¶ 5.)  Plaintiffs do not specify any portion of the recording that illustrates such a "cooperative" attitude or demeanor, however, and the certified transcript  reveals Aragonez's repeated use of racial epithets, insults, curses, and vulgarities  directed at Huff. (Garcia Decl., Ex. 2, throughout.)

[11] It is undisputed that Recatto had no involvement with the preparation of the Report. (RSUF ¶ 18.)

[12] Although neither party provides any information regarding the basis for the charges, the Court assumes the property at issue was the windows in the patrol car in which Plaintiffs were first placed, and in the patrol car in which Aragonez was later placed.

1    Superior Court's ruling has been provided to the Court.)

2    See Christensen Decl. 6, Ex. 4 (transcript excerpts);

3    Santa Romana Decl. 7, Ex. 6 (same).  On October 10, 2006,

4    the Superior Court granted the prosecution's motion to

5    dismiss all charges against Aragonez and Lozano.

6    (Christensen Decl., Ex. 4 at 3; HSUF ¶ 2.)

7

8                        **IV. DISPUTED FACTS**

9        Defendants claim to have encountered Aragonez first

10   when he was walking along the sidewalk, approximately 100

11   feet from his mother's house.  (Recatto Dep. 48:7-25;

12   Report at 3.)  As the officers drove by, Aragonez was

13   looking over his shoulder at their car.  (Recatto Dep.

14   49:5-8).  The officers sought to initiate a consensual

15   pedestrian contact, but lost sight of Aragonez. (Recatto

16   Dep. 50:5-8).  Plaintiffs claim Aragonez was not walking

17   along the street that evening, and did not become aware

18   of the officers until they pulled into the driveway.

19   (PSGI ¶¶ 31-34.)

20

21       Recatto claims both Aragonez and Lozano appeared

22   intoxicated throughout the encounter.  He observed Lozano

23   was belligerent, was slurring his speech, had the odor of

24   alcohol on his breath, and his eyes were booodshot and

25   watery.  (Recatto Dep. 106:13-17.)  Recatto also noted

26   Aragonez's eyes were bloodshot, red, and watery, and he

27

28

                                11

1  was acting belligerently, though Recatto never had a full

2  chance to evaluate him.  (Recatto Dep. 108:7-11.)

3

4      Plaintiffs maintain they were not drunk, although

5  Lozano admits having consumed one 24-ounce beer. (PSGI ¶¶

6  21-23.)  Plaintiffs offer the testimony of a neighbor,

7  Darlene Brown, who was present and "less than one car-

8  length" away from Plaintiffs and Defendants during the

9  initial encounter in the driveway.  According to Ms.

10  Brown, neither Aragonez nor Lozano appeared intoxicated.

11  (PSGI ¶¶ 25-26.)

12

13      Lozano claims that, when Recatto approached him and

14  told him to put the compressor down and put his hands

15  behind his back, Recatto held Lozano's hands behind his

16  back.  (Lozano Dep. 46:19-24.)  Recatto claims he never

17  touched Lozano.  (RSUF ¶ 13.)

18

19      Once in the patrol car, Plaintiffs contend they were

20  confused about where the officers were taking them

21  because they did not recognize the route, and the

22  officers would not answer their questions about their

23  destination. (PSGI ¶¶ 60-62.)  Only then, Plaintiffs

24  maintain, did they kick out the windows in the patrol

25  car, because they doubted the authenticity of the

26  officers' identity.  (PSGI ¶ 63.)

27

28

1    Recatto maintains he responded to Plaintiffs'
2    questions and told them they were not going to the
3    Victorville prison, but to the West Valley Detention
4    Center.  (Recatto Dep. at 117-118.)  At that point,
5    according to Recatto, Plaintiffs launched racial
6    invective toward him, and began spitting at the officers.
7    (Recatto Dep. at 118-119.)  A few minutes later, Recatto
8    heard a noise and saw that Aragonez had kicked out the
9    window in the backseat and was trying to hang out the
10   window.  (Recatto Dep. at 120.)  Aragonez then told
11   Lozano to do the same, and Lozano kicked out the window
12   on his side of the car.  (Recatto Dep. at 121.)
13
14   Recatto claims Plaintiffs were still cursing and
15   yelling when the officers stopped the patrol car at the
16   restaurant parking lot, and Huff then sprayed each with a
17   chemical spray through the broken window for 2 or 3
18   seconds. (Recatto Dep. at 128-129).  According to
19   Plaintiffs, on the other hand, they were sitting "quietly
20   and still" after kicking the windows out of the car, when
21   without any warning Huff, laughing, sprayed each of them
22   twice at close range with chemical spray, pausing for
23   over a minute between each spray.  (PSGI ¶¶ 64-71.)
24
25   Once he was placed in the second patrol car, Aragonez
26   claims, Huff turned the heat up and rolled up the
27   windows, making it difficult for him to breathe.
28

13

1   Aragonez contends he screamed for help, and eventually
2   "managed to kick another window out, but just slightly."
3   (PSGI ¶ 74.) According to Recatto, however, he never
4   heard Aragonez yelling in the car, and no one on the
5   scene reported hearing Aragonez complain about the heat
6   in the car.  (Recatto Dep. 137:6-23.)

7

8                         **V. DISCUSSION**
9       **A.   The Fourth Amendment Claims Against Recatto**
10               **1.   Recatto's responsibility for the events**

11

12       Recatto moves for summary judgment on all three of
13  Plaintiffs' Fourth Amendment claims on the basis that he
14  did not detain, arrest, or use force against either
15  Aragonez and Lozano.

16

17       Recatto's mere presence at the scene of the incident
18  is not enough to establish liability.  "In order for a
19  person acting under color of state law to be liable under
20  section 1983 there must be a showing of personal
21  participation in the alleged rights deprivation." Jones
22  v. Williams, 297 F.3d 930, 934 (9th Cir. 2002).  To
23  prevail against Recatto on their claims, Plaintiffs must
24  demonstrate either that his actions constituted "integral
25  participation" in the alleged violation, see Torres v.
26  City of Los Angeles, --- F.3d ---, No. 06-55817, 2008 WL
27  4878904 at *5 (9th Cir. Nov. 14, 2008), citing Chuman v.

28

                                14

1  <u>Wright</u>, 76 F.3d 292, 294-95 (9th Cir. 1996), or that

2  Recatto's failure to intervene was itself a violation of

3  his constitutional duties, <u>see</u> <u>Ting v. U.S.</u>, 927 F.2d

4  1504, 1511 (9th Cir. 1991).

5

6       Thus, the Court first analyzes the extent, if any, of

7  Recatto's involvement in the allegedly wrongful acts to

8  determine the extent to which he can be held liable under

9  either theory.

10

11            a.    **Recatto's participation in the early**

12                  **stages of the encounter**

13       Plaintiffs do not dispute that Recatto was not

14  directly involved in the initial detention of Aragonez.

15  (PSGI ¶¶ 45-49.)  Rather, he merely acted as the

16  "covering" officer.  (Recatto Dep. 87:10-15.)  Recatto

17  did participate in the arrest and detention of Lozano to

18  a greater degree, however.  The parties agree Recatto

19  told Lozano to put down the compressor and put his hands

20  behind his back. (PSGI ¶ 51; Recatto Dep. 100:16-17.)

21  Whether or not anything else happened is disputed, as

22  Lozano alleges that Recatto briefly "held" his hands

23  behind him. (Lozano Dep. 46:19-24.)

24  ///

25  ///

26  ///

27  ///

28

The only evidence Plaintiffs cite in support of this is the following deposition testimony of Lozano:

> Recatto tells me, "Keep your hands out of your pockets." And I think he said, "Turn around." And he just held my hand until – and then right away, Huff comes to me.

(Lozano Dep. 46:19-22.) Asked to describe how Recatto held his hands, Lozano responded "Just held them behind me. You know." (Id. at 46:23-24.)

There are no other allegations of physical interaction between Recatto and either Plaintiff. Plaintiffs do not dispute that Recatto was not involved in the chemical spraying in the restaurant parking lot. They do allege, however, he did nothing to stop the spraying from occurring, though he could have done so. (PSGI ¶¶ 77-78; Aragonez Dep. 180:22-25.)

### b. Integral Participation

To hold an officer liable for his participation as part of a team or group of officers, a plaintiff must show the officer "integrally participated" via "some fundamental involvement in the conduct that allegedly caused the violation." Blankenhorn v. City of Orange, 485 F.3d 463, 481 n. 12 (9th Cir. 2007). While there is no bright-line test for determining what constitutes "fundamental

involvement," courts have interpreted the integral
participation standard to require either physical
interaction with a suspect, or some knowledge or
control over the challenged conduct.  See Torres,
2008 WL 4878904 at *5, (finding no integral
participation where there was no evidence that
defendant had "instructed the other detectives to
arrest [plaintiff] or that any of those detectives
consulted with [plaintiff] before making the
arrest"); Blankenhorn, 485 F.3d at 481 n. 12 (finding
assistance in handcuffing a suspect was integral
participation, but providing crowd control was not);
Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir.
2004) (finding officers could be liable for excessive
force they did not personally deploy where they were
"aware of the decision to use the flash-bang, did not
object to it, and participated in the search
operation knowing the flash-bang was to be
deployed"); Myser v. Spokane County, No. CV-06-24-
FVS, 2008 WL 4833294, at *9 (E.D. Wash. Nov. 3, 2008)
(granting summary judgment and finding no integral
participation even though evidence showed officer
"was nearby and should have paid closer attention to
what the deputies were doing").
///
///
///

17

**c.   Failure to Intervene/ Bystander**
**Liability**

The Ninth Circuit has noted that "police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." U.S. v. Koon, 34 F.3d 1416, 1446-47 n. 25 (9th Cir. 1994), rev'd on other grounds by 518 U.S. 81 (1996); Estate of Brutsche v. City of Federal Way, No. C05-1538Z, 2006 WL 3734153, at *5- *6 (W.D. Wash. Dec. 14, 2006).  If a bystander officer fails to fulfill this duty, he can face the same liability as colleagues who directly violated the suspect's rights.  Id.  Bystander officers only have a duty to stop a violation, though, where they know or have reason to know of the constitutional violation.  Ting v. U.S., 927 F.2d 1504, 1511 (9th Cir. 1991), see also Ramirez v. Butte-Silver Bow County, 298 F.3d 1022, 1029-30 (9th Cir. 2002) (holding that bystander officers could not be held liable for failing to stop an unlawful search where they had no reason to believe the warrant at issue was defective).

**2.   The Excessive Force Claim**

Although neither Plaintiff alleges Recatto personally used excessive force on them, it is well-settled that, once a suspect is taken into custody,

law enforcement officers have a duty to protect the
suspect's safety.   See United States v. Reese, 2
F.3d 870, 887-88 (9th Cir. 1993).   Therefore, Recatto
can be held liable if (1) excessive force was used
against Plaintiffs; and (2)he was an "integral
participant" or had reason to believe excessive force
was being used and could have, but failed to, stop
it.

     To determine if a use of force was excessive,
the finder of fact must consider "whether the use of
force was objectively reasonable in light of the
facts and circumstances confronting" the arresting
officers.   Blankenhorn v. City of Orange, 485 F.3d
463, 477 (9th Cir. 2007), quoting Graham v. Connor,
490 U.S. 386, 397 (1989) (internal quotation marks
omitted).   Plaintiffs allege the use of chemical
spray against them was excessive force.   (Opp'n-
Recatto at 11.)

     The parties dispute at least some of the events
leading up to Huff's use of the chemical spray.
While Recatto claims Plaintiffs were spitting and
kicking at the officers, (Recatto Dep. at 113-114.)
Plaintiffs contend they were sitting "quietly and
still," when, without notice each was sprayed twice
in the eyes with chemical spray.   (PSGI ¶¶ 64-65.)

1  They further claim there was pause of over a minute

2  between sprays. (PSGI ¶¶ 64-71.)  Viewing this

3  factual dispute in the light most favorable to

4  Plaintiffs, the Court cannot conclude that no

5  reasonable jury would find this spraying to be

6  objectively unreasonable and that Recatto did not

7  have an opportunity to intervene.

8

9      In light of this triable issue of fact, the

10  Court cannot determine whether or not Recatto

11  breached his duty to protect a suspect's safety once

12  in custody, or reach the issue whether Recatto is

13  entitled to qualified immunity on the basis that his

14  conduct did "not violate clearly established

15  statutory or constitutional rights of which a

16  reasonable person would have known."  Harlow v.

17  Fitzgerald, 457 U.S. 800, 818 (1982).

18

19          **3.    The False Arrest and Detention Claims**

20               **a) Aragonez's Claims**

21      Plaintiffs have pointed to no authority holding

22  an officer is responsible when another officer

23  unlawfully detains or arrests a suspect under either

24  an integral participation or failure to intervene

25  theory.  Nonetheless, a claim is feasible under

26  either theory.

27

28

                            20

1    Plaintiffs argue that by "covering" Sergeant

2 Huff during the incident, Recatto's participated

3 sufficiently to be held liable for Aragonez's

4 detention and arrest.  They have produced no evidence

5 to show that Huff consulted with Recatto before

6 making the decision to detain and arrest Aragonez,

7 however.  It is undisputed that Huff and Recatto had

8 no communications with one another from the time the

9 officers got out of the car until after Aragonez was

10 arrested.[13]  Providing cover is "an essentially

11 defensive posture." <u>Neuburger v. Thompson</u>, 305 F.

12 Supp.2d 521, 530 (W.D. Pa. 2004).  As an act designed

13 to secure an area and minimize the risks of

14 unexpected danger, it is analogous to crowd control,

15 which the <u>Blankenhorn</u> court determined was not a

16 sufficient basis for liability.

17

18    As such, the Court finds Plaintiffs have failed

19 to produce evidence that Recatto integrally

20 participated in the arrest or detention of Aragonez,

21 and thus cannot prevail on such a theory.  <u>See Travis</u>

22 <u>v. Village of Dobbs Ferry</u>, 355 F.Supp.2d 740, 753

23 (S.D.N.Y. 2005) (granting summary judgment in favor

24 of backup officers where plaintiff failed "to provide

25 evidence to support her claim that they were

---

26    [13]    At hearing on this motion, Plaintiffs' counsel
suggested Huff only decided to arrest Aragonez once
27 Aragonez started belligerently yelling and cursing at
Huff.  This would preclude any determination that Recatto
28 knew Huff was going to arrest Aragonez.

1   personally involved in her arrest or evidence that
2   they were in a position to stop the illegal arrest
3   and failed to do so").

4

5       As for a bystander liability theory, it may be
6   difficult or impossible for a bystander officer to
7   know whether another officer, in the moment, is
8   acting based on the reasonable suspicion or probable
9   cause required.  See also U.S. v. Ramirez, 473 F.3d
10  1026 (9th Cir. 2007) (discussing "collective
11  knowledge" or "fellow officer" doctrine).  Still,
12  under the cases discussed above, a claim based on an
13  officer's failure to intervene is plausible if an
14  officer knew or had reason to know his colleague was
15  engaging in an unlawful arrest or detention.[14]

16

17      Here, there is no evidence to suggest that
18  Recatto knew or had reason to know that Huff was
19  acting without either probable cause[15] or reasonable
20  suspicion[16] in arresting or detaining Aragonez.[17]  The

21      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
         [14] Contrary to Plaintiffs' assertions, an officer
22  need not establish that he personally observed evidence
    to support his colleague's decision to arrest or detain.

23      [15] See U.S. v. Hernandez, 322 F.3d 592, 596 (9th Cir.
24  2002) (explaining probable cause standard). On this
    motion, there is no need to address whether Huff had
25  probable cause to arrest Aragonez.  Even assuming
    probable cause was lacking, Recatto could only be liable
26  if he knew or had reason to know it was lacking.

27      [16] See Terry v. Ohio, 392 U.S. 1 (1968) (establishing
    reasonable suspicion standard). As with the probable
28                                        (continued...)

22

undisputed evidence shows Recatto was not involved in any interaction between Aragonez and Huff at all.

As such, Recatto is entitled to summary judgment on the claims by Aragonez for false arrest and excessive detention claims against him.

### b) Lozano's Claim

There is no dispute that Recatto had any involvement in the decision to arrest Lozano, and there is no evidence to suggest that Recatto had any reason to believe Huff was acting unlawfully in arresting Lozano.  Accordingly, Recatto is entitled to summary judgment as to Lozano's false arrest claim.

It is undisputed, though, that Recatto did detain Lozano.  A detention is deemed a Fourth Amendment seizure when, "taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to

_____

[16](...continued)
cause determination, there is no need to conclude whether there was reasonable suspicion for detaining Aragonez.

[17]   While, on a summary judgment motion, the Court is to "draw[] all reasonable inferences supported by the evidence," <u>Noyes v. Kelly Services</u>, 488 F.3d 1163, 1167 (9th Cir. 2007)  the Court is not required to indulge the mere speculation advanced by Plaintiffs' counsel at the hearing that Recatto "must have" known that Huff planned to unlawfully detain and arrest Aragonez.

23

ignore the police presence and go about his business." <u>U.S. v. Washington</u>, 490 F.3d 765, 769 (9th Cir. 2007), <u>quoting</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991) (internal marks omitted).  By ordering Lozano to put down the generator and allegedly holding Lozano's hands behind his back, Recatto thus "seized" Lozano for Fourth Amendment purposes, and thus can be held responsible on a theory of direct liability if this seizure was unconstitutional.

Recatto violated Lozano's constitutional rights if he detained him without reasonable suspicion of criminal activity supported by "specific and articulable facts" and "rational inferences from those facts." <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968). In determining whether reasonable suspicion is present, a reviewing court is to consider the totality of the circumstances known to the officer. <u>United States v. Arvizu</u>, 534 U.S. 266, 273-275 (2002).  The Court cannot fully analyze the totality of circumstances here, however, since key facts are unclear or disputed.

Recatto has explained that he suspected a residential burglary might be underway when he saw Lozano emerge from behind the house carrying a compressor towards the truck.  (Recatto Dep. at 79-

80.)  At the same time, Huff, his partner on the
scene, was engaged with Aragonez, who was cursing and
shouting racist invective.  (<u>Id.</u>, PSGI ¶ 8.)  Huff
was either in the process of arresting Aragonez, or
had just done so.  While these facts are undisputed,
the combination is insufficient to establish a
reasonable suspicion of burglary as a matter of law.

A police officer may detain an individual to
prevent ongoing or imminent crime, provided he
"observes unusual conduct which leads him reasonably
to conclude in light of his experience that criminal
activity may be afoot."  <u>U.S. v. Grigg</u>, 498 F.3d
1070, 1075 (9th Cir. 2007), quoting <u>Terry</u>, 392 U.S.
at 30.  Recatto has not shown that it is sufficiently
unusual to carry a compressor out of a house in the
early evening as to establish reasonable suspicion of
criminal activity.  Nor has Recatto explained how
Aragonez's behavior, though perhaps giving rise to
suspicion that Aragonez had committed some crime,
created a "reasonable inference" that Lozano was
engaged in criminal activity.

While the Court cannot, at this stage, conclude
that Recatto definitively did have reasonable
suspicion, such a finding is not barred by the
evidence before the Court.  Since "[c]onduct that

alone may appear innocent can be suspicious when viewed in context of other information or surrounding circumstances that police are aware of," <u>People of Territory of Guam v. Ichiyasu</u>, 838 F.2d 353, 355-56 (9th Cir. 1988), a jury, upon a fuller examination of the totality of circumstances, may conclude that Recatto's suspicion was reasonable.  See also <u>U.S. v. Arvizu</u>, 534 U.S. 266 (2002)(explaining that seemingly innocent actions may justify detention when placed in larger context).  In addition, Recatto's observation that Lozano appeared intoxicated, (Recatto Dep. 79:9-13), could be sufficient to establish reasonable suspicion of criminal activity, i.e., public drunkenness.  However, Plaintiffs dispute whether Recatto had any reason to suspect intoxication, and it is unclear whether Recatto had any chance to observe Lozano's behavior before detaining him.

While Recatto independently moves for summary judgment on this claim on the basis of qualified immunity, the parties' factual disputes must be resolved to determine whether Recatto violated clearly established law when he detained Lozano.  See <u>Harlow</u>, 457 U.S. 800, <u>supra</u>.  Recatto therefore has not carried his burden of showing he is entitled to qualified immunity as a matter of law.

1     In light of the undisputed facts, the Court

2     grants summary judgment in favor of Recatto on the

3     unlawful arrest claim against him brought by both

4     Plaintiffs, and the unlawful detetntion claim as to

5     Aragonez.   Due to the remaining factual uncertainty,

6     the Court denies Recatto's motion for summary

7     judgment as to Lozano's unlawful detention claim.

8

9        **B.   The Fourteenth Amendment Claim**

10    Plaintiffs bring a claim against both Lozano and

11    Recatto under the substantive due process component

12    of the Fourteenth Amendment for "providing false or

13    misleading information" in the Report.[18]   While this

14    claim originally named Huff and Recatto, Compl. ¶¶

15    33-41, Plaintiffs now concede that there is no

16    evidence Recatto was involved in drafting the report.

17    Thus, Plaintiffs concede the claim as to Recatto has

18    no merit.   Accordingly, the Court grants summary

19    judgment in favor of Recatto on the Fourteenth

20    Amendment claim.

21

22    Plaintiffs now characterize their claim against

23    Huff as one of deliberate falsification of evidence,

24    based on the Ninth Circuit's decision in <u>Devereaux v.</u>

25    _____

26    [18] While Plaintiffs initially claimed that the
      withholding of the belt recording was a substantive due
27    process violation, (Compl. ¶ 39), they now only argue
      that the presentation of "false evidence" via the police
28    report is the basis of their claim.   <u>See</u> Opp'n-Huff at
      11-12.

Abbey, 263 F.3d 1070 (9th Cir. 2001)(en banc).
Devereaux concerned the investigation and prosecution
of a foster parent for alleged sexual abuse of foster
children living in his home.  263 F.3d at 1073.
Based on interviews of questionable validity,
Devereaux was charged with several felonies.  Id.
After a yearlong investigation, the felony charges
were dropped in exchange for Devereaux's guilty plea
to two misdemeanor counts (rendering criminal
assistance and fourth-degree assault for spanking one
foster child).  Id.  Devereaux sued various
investigators and state employees for violating his
civil rights in the course if the investigation,
saying they used improper interview techniques with a
known tendency to produce false testimony.  Id. at
1075.

       Even though Devereaux was convicted as a result
of the investigation, an en banc Ninth Circuit panel
held that, even absent a conviction, "there is a
clearly established constitutional due process right
not to be subjected to criminal charges on the basis
of false evidence that was deliberately fabricated by
the government."  263 F.3d at 1074-75; see also
Cunningham v. City of Wenatchee, 345 F.3d 802, 811
(9th Cir. 2003).  To survive summary judgment on that
claim, though, the court held a plaintiff must point

1  to evidence that, at a minimum, shows that "(1)
2  Defendants continued their investigation of
3  [Plaintiff] despite the fact that they knew or should
4  have known that he was innocent; or (2) Defendants
5  used investigative techniques that were so coercive
6  and abusive that they knew or should have known that
7  those techniques would yield false information."  263
8  F.3d at 1076; see also Ramirez v. County of Los
9  Angeles, 397 F. Supp.2d 1208, 1226 (C.D. Cal. 2005).
10  Here, Plaintiffs do not claim Defendant Huff's method
11  of taking a police report was improper, so only the
12  first prong is relevant.

13

14      Plaintiffs argue the Court should construe
15  Devereaux broadly.  However, some courts have
16  questioned the continued viability of a Devereaux
17  claim at all.  See, e.g., Bastidas v. City of Los
18  Angeles, No. CV 04-8902-GAF, 2006 WL 4749706 at *6
19  (C.D. Cal. 2006).  Moreover, not only are Plaintiffs
20  unable to establish any evidence to suggest Huff, or
21  any other officer, knew Plaintiffs were innocent of
22  the charges against them, i.e., vandalism of public
23  property, but they fail to show any specific
24  falsehoods or omissions that have given rise to a
25  constitutional injury.[19]  None of the facts in the

26  _____
       [19] Plaintiffs argue that Huff's failure to testify
27  about the accuracy of the Report creates a presumption of
    falsehood.  (Opp'n-Huff at 14.)  However, several of the
28                              (continued...)

police report that they dispute have any relevance to the question of whether or not they committed that crime.  Plaintiffs were charged with vandalism after they undisputedly kicked out the windows of a police car.[20]

Plaintiffs' allegations boil down to two complaints.  First, they contend the Report was faulty, as it reveals the investigation was not particularly thorough.  Second, Plaintiffs disagree with the arresting officer's description of the events of the evening.  But as one court applying <u>Devereaux</u> has noted, "a careless or inaccurate investigation that does not ensure an error-free result does not rise to the level of a constitutional violation."  <u>Costanich v. Washington</u>, No.  C05-0090MJP, 2008 WL 1968775 at *11 (W.D. Wash. May 2,

---

[19](...continued) challenged aspects of the report are demonstrably true based on other evidence on the record.  For example, Plaintiffs challenge the Report's characterization of them as  "completely uncooperative and combative" and "completely belligerent and uncooperative." (PSGI-Huff ¶¶ 76, 80, 83.) Rather, they claim there was only "some" non-cooperation.  (PSGI-Huff ¶ 76.) As a matter of law, a dispute over such a subjective inquiry is not evidence of deliberate falsification.  Other challenged aspects of the report, including the earlier encounter with Aragonez, are substantiated by Recatto's testimony.

[20] At hearing, Plaintiffs' counsel argued that Plaintiffs may have had an affirmative defense of "necessity."  However,  their claimed necessity - that they believed the officers were not real officers or they were not truly being taken to the West Valley Detention Center- has no relationship to the alleged falsehoods or omissions in the Report.

1  2008).  <u>Devereaux</u> makes clear that a deliberate

2  falsification claim requires evidence that an officer

3  knew of the plaintiff's innocence, and proceeded

4  anyway.  No such evidence has been presented here.

5

6      Accordingly, the Court grants summary judgment

7  as to the Fourteenth Amendment claim against Huff.

8

9                    **V. CONCLUSION**

10     For the foregoing reasons, the Court GRANTS

11  Defendant Recatto's Motion for Summary Judgment in

12  part and DENIES it in part.  The Court GRANTS summary

13  judgment in favor of Recatto on Plaintiff's claims as

14  follows: (1) unlawful detention claim as to Aragonez,

15  (2) false arrest claim as to both Defendants, and (3)

16  Fourteenth Amendment substantive due process claim.

17  The Court DENIES the motion for summary judgment as

18  to the excessive force claim and the unlawful

19  detention claim as to Lozano.  As discussed above,

20  the Court GRANTS Defendant Huff's Motion for Partial

21  Summary Judgment as to the Fourteenth Amendment

22  substantive due process claim against him.

23

24  Dated:  November 18, 2008 _____

25                              VIRGINIA A. PHILLIPS
                               United States District Judge

26

27

28